UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| LM INSURANCE CORPORATION, an Illinois corporation, | ) Civil Action No.: 7:14-CV-3634-BHH ) ) |
| Plaintiff, | ) |
| vs. | ) **Opinion and Order** |
| CONTINGENT RESOURCE SOLUTIONS, LLC, a South Carolina corporation, | ) ) ) |
| Defendant and Third-Party Plaintiff, | ) ) |
| vs. | ) ) |
| GUARANTEE INSURANCE COMPANY, | ) ) |
| Third-Party Defendant. | ) ) |

This matter is before the Court on Third-Party Defendant Guarantee Insurance Company's ("GIC") Motion to Dismiss (ECF No. 48) the Third-Party Complaint brought by Defendant and Third-Party Plaintiff Contingent Resource Solutions, LLC ("CRS") for failure to state a claim upon which relief can be granted and GIC's Motion to Stay Discovery, Disclosure, and Conference Deadlines (ECF No. 52). For the reasons set forth in this Order, GIC's Motion to Dismiss is denied and GIC's Motion to Stay is denied as moot.

**BACKGROUND**

By way of its Complaint filed September 12, 2014, LM Insurance Corporation ("LMIC") seeks $533,301 in damages from CRS for CRS's alleged breach (failure to pay premium) of a workers compensation insurance contract. (ECF No. 1.) CRS filed an Answer and Counterclaim against LMIC (ECF No. 6), and later an Amended

1

Counterclaim (ECF No. 21) and a Second Amended Counterclaim and Third-Party Complaint impleading GIC (ECF No. 40).

The State of South Carolina requires employers, subject to certain exceptions, to purchase workers compensation insurance coverage for their employees.[1] If a South Carolina employer is unable to find an insurance company that will voluntarily sell workers compensation insurance to that employer, the employer may apply to the Workers Compensation Insurance Plan (the "Plan") for an assigned risk market insurance policy, also known as an "involuntary market policy" or "residual market policy." The Plan is a set of rules governing the terms and conditions by which employers purchase and insurance companies sell assigned risk policies in South Carolina. An employer seeking an assigned risk policy makes an application on an approved form to the National Council on Compensation Insurance ("NCCI"). Once an application is made, NCCI assigns the employer to an insurance company participating in the Plan.

Premium for such involuntary market policies is determined by the employer's payroll and the type of work performed by the insured employees, as categorized by various job classification codes. The employer discloses on the application the amount of its anticipated payroll and the classification of work performed by its employees. Premium rates vary based on the relative hazard associated with different job classifications, and such rates are set by the State of South Carolina for policies applicable to South Carolina employees.

---

[1] Except where otherwise indicated, the Court's factual summary is distilled from LMIC's allegations in the initial Complaint (ECF No. 1).

On May 23, 2013, CRS applied for an assigned risk policy using the prescribed form and NCCI subsequently assigned LMIC to provide such a policy. LMIC issued a workers compensation policy (the "LMIC Policy") to CRS with a projected coverage period of May 24, 2013 to May 24, 2014. LMIC alleges that pursuant to the terms of the LMIC Policy, CRS was to make its books and records available for audit in order that LMIC might determine the correct amount of payroll and job classifications and thereby calculate the proper premium due to LMIC.

LMIC contends that its audit revealed that the CRS payroll covered by the LMIC Policy was $9,209,552 *per annum*, rather than the $32,000 *per annum* reflected on CRS's application for the assigned risk policy. LMIC calculated the relevant premium as $973,974, assuming the policy was to be in effect for the full one year term, and thereafter sought payment from CRS for the premium amount determined by the audit. LMIC avers that CRS failed to pay the amount due under the policy, and after sending a notice of pending cancellation if the premium was not paid, LMIC cancelled the policy effective January 14, 2014. LMIC subsequently conducted a cancellation audit of CRS's business records and determined that the amount of payroll putatively covered by the policy from May 24, 2013 until January 14, 2014 was $5,023,475. Accordingly, LMIC sent CRS a final invoice seeking payment of $533,301 in premium for the coverage it claims to have provided during the relevant time period. It is this amount that LMIC seeks in damages for CRS's alleged breach of the assigned risk insurance contract.

CRS contends that when it applied to NCCI for the involuntary market policy, it only sought coverage for a limited subset of employees that were not already covered by its existing voluntary market policy provided by GIC. (Second Amend. Counterclaim

and Third-Party Compl., ECF No. 40.) LMIC appears to dispute that it is possible to obtain an assigned risk policy to cover only a limited subset of employees. (*See* Compl. ¶ 15, ECF No. 1 ("An employer's workers compensation assigned risk policy covers all of the employees for the employer.").)

By way of its Second Amended Counterclaim and Third-Party Complaint, CRS asserts that the vast majority of its employees were already covered by a different workers compensation insurance policy and that LMIC is not entitled to the monies it now claims are damages for uncompensated insurance coverage. CRS alleges that from February 15, 2013 to September 1, 2013, CRS workers in Florida, North Carolina, South Carolina, and Virginia were covered by GIC Policy No. GWGC374000002-112 (the "First GIC Policy"). (ECF No. 40 at ¶¶ 6-7.) The First GIC Policy purportedly covered all CRS workers except those workers in North Carolina and Virginia classified under code 5183 (Plumbing Not Otherwise Classified and Drivers) for workers compensation insurance. (*Id.* at ¶ 8.) At the time, GIC allegedly would not provide voluntary coverage for CRS workers classified under code 5183 in North Carolina and Virginia but did cover code 5183 workers in South Carolina. (*Id.* at ¶ 9.) CRS asserts that GIC received $109,420.58 in premium for the First GIC Policy, though it is non-specific as to who paid this premium to GIC (*i.e.* CRS or some other entity). (*Id.* at ¶ 11.)

Sometime after the First GIC Policy was already in place, CRS anticipated new operations in South Carolina requiring workers to perform services classified under codes 5190 (Electrical Wiring – Within Buildings and Drivers) and 6325 (Conduit Construction – For Cables and Wires and Drivers). (*Id.* at ¶10.) CRS states that its May 23, 2013 application to NCCI for assigned risk coverage was limited to code 5183

4

workers in North Carolina and Virginia, and codes 5190 and 6325 workers in South Carolina. (*Id.* at ¶ 12-13.) CRS asserts that its application explicitly indicated as much, relying on the following language typed in all capital letters: "THIS POLICY IS BEING OBTAINED TO COVER DIRECT EMPLOYEES WORKING IN RISKS THAT THE PEO'S CARRIER WILL NOT APPROVE." (*Id.* at ¶ 15; Ex. A, Compl., ECF No. 1 at 13.) According to CRS, the business requiring services under codes 5190 and 6325 did not materialize, and CRS workers never performed services or activities under those codes in South Carolina. (ECF No. 40 at ¶ 14.)

CRS states that it intended and understood the coverage provided by the LMIC Policy to be limited to those locations and class codes specifically itemized in its application to NCCI. (*Id.* at ¶ 15.) CRS avers that LMIC received $5,127 in premium for the LMIC Policy, which was in effect from May 24, 2013 to January 14, 2014. (*Id.* at ¶¶ 16, 19.) LMIC acknowledges that CRS paid that amount. (*See* Ex. D, Compl., ECF No. 1 at 94-95.)

CRS further alleges that from September 1, 2013 to September 1, 2014, all CRS workers were insured under GIC Policy No. WCP00000402GIC (the "Second GIC Policy"). (ECF No. 40 at ¶ 20.) Coverage under the Second GIC Policy purportedly extended to all CRS workers in all states and for all class codes. (*Id.* at ¶ 21.) CRS asserts that GIC received premium for the Second GIC Policy, though it is non-specific as to who paid this premium and in what amount. (*Id.* at ¶ 22.) CRS indicates that it has declined to pay LMIC the $533,301 premium LMIC claims as a result of the cancellation audit because such an amount "does not comport with the limited coverage of the LMIC Policy as applied for by CRS and issued by LMIC and purports to include amounts for

5

coverages on or after September 1, 2013, when all CRS workers were covered by the Second GIC Policy." (*Id.* at ¶ 27.) Ultimately, CRS and LMIC do not agree as to whether worker classification codes can be split among and between markets and workers compensation insurance policies, *i.e.* whether CRS could have insured some workers in the voluntary market through GIC and other workers through an assigned risk plan with LMIC. (*See id.* at ¶ 26.)

By way of relief, CRS first seeks a declaratory judgment that LMIC covered only those CRS workers in North Carolina and Virginia classified under code 5183 until September 1, 2013, and GIC covered all other CRS workers during the disputed time period of May 24, 2013 to January 14, 2014. (*Id.* at ¶ 31, Count I.) In the alternative, CRS seeks a declaratory judgment that: (a) the LMIC Policy was void as to all workers in North Carolina and South Carolina and the First GIC Policy covered all CRS workers in those states; or (b) if LMIC is deemed to have covered all CRS workers in North Carolina, South Carolina, and Virginia during the disputed period, then a declaration that the GIC policies are reformed to eliminate overlapping and duplicative coverage provided by LMIC during the disputed period.[2] (*Id.* at ¶¶ 32-33, Count I.) CRS next seeks rescission of the LMIC Policy based on alleged mutual mistakes of fact regarding the coverage as applied for and as bound. (*Id.* at ¶¶ 39-40, Count II.) In the alternative, CRS seeks rescission of the LMIC Policy due to CRS's unilateral mistake of fact regarding the scope of coverage, about which LMIC allegedly had knowledge yet remained silent. (*Id.* at ¶¶ 41-42, Count II.)

---

[2] Under this third version of the requested declaratory judgment, CRS asserts that GIC must return all premium and deductibles paid to GIC during the disputed period for workers covered by the LMIC Policy, and that LMIC must assume all claims from the disputed period. (ECF No. 40 at ¶ 33; *see also* Count IV.)

In the event the LMIC Policy is not rescinded due to either a mutual or unilateral mistake of fact, CRS seeks to reform the LMIC Policy to cover only those CRS workers in North Carolina and Virginia classified under code 5183 for a minimum period of May 24, 2013 to September 1, 2013, or a maximum period of May 24, 2013 to January 14, 2014. (*Id.* at ¶ 47, Count III.) Finally, if the Court determines that LMIC covered all CRS workers in North Carolina and South Carolina during the disputed period, CRS seeks reformation (by way of separate Count than the declaratory judgment) of: (a) the First GIC Policy to cover CRS workers in North Carolina and South Carolina for only that period of time from February 15, 2013 to May 23, 2013, based upon a mutual mistake as to the scope of coverage; and (b) the Second GIC Policy to cover CRS workers in North Carolina, South Carolina, and Virginia for only that period of time from January 15, 2014 to September 1, 2014, based upon a mutual mistake as to the scope of coverage. (*Id.* at ¶¶ 49-50, Count IV.) In conjunction with the putative reformation of the GIC Policies, CRS claims that GIC would be required to refund all premium and deductibles paid to GIC for coverage of CRS workers in North Carolina, South Carolina, and Virginia from May 23, 2013 to January 14, 2014. (*Id.* at ¶ 51, Count IV.)

GIC filed a Motion to Dismiss (ECF No. 48) pursuant to Fed. R. Civ. Pro. 12(b)(6) on June 18, 2015. CRS filed a Response (ECF No. 58) on July 16, 2015, and GIC filed its Reply on July 27, 2015 (ECF No. 59). In addition, on June 25, 2015 GIC filed a Motion to Stay Discovery, Disclosure, and Conference Deadlines (ECF No. 52) pending the outcome of its Motion to Dismiss. CRS consented in the Motion to Stay; however, LMIC filed a Response and Objection (ECF No. 55) on July 10, 2015. GIC filed its Reply

(ECF No. 56) on July 15, 2015. The Court has thoroughly reviewed these filings and now issues the following rulings.

## **STANDARD OF REVIEW**

A plaintiff's complaint should set forth "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556)). In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff . . . ." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). A court should grant a Rule 12(b)(6) motion if, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

As previously noted, to survive a Rule 12(b)(6) motion to dismiss a complaint must state "a *plausible* claim for relief." *Iqbal*, 556 U.S. at 679 (emphasis added). "The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557). Stated differently, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Still, Rule 12(b)(6) "does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Colon Health Centers of Am., LLC v. Hazel*, 733 F.3d 535, 545 (4th Cir. 2013) (quoting *Neitzke v. Williams,* 490 U.S. 319, 327 (1989)). "A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss . . . ." *Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico*, 628 F.3d 25, 30 (1st Cir. 2010).

Generally, "[when] resolving a motion pursuant to Rule 12(b)(6) . . . , a district court cannot consider matters outside the pleadings without converting the motion into one for summary judgment." *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013). However, "when a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss the complaint and the [c]ourt may consider the same without converting the motion to one for summary judgment." *Gasner v. Cnty. of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995), *aff'd*, 103 F.3d 351 (4th Cir. 1996) (citing 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil*, § 1327, at 762-63 (2d ed. 1990)); *accord Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (the court may properly

consider documents "attached to the complaint . . . as well those attached to the motion to dismiss, so long as they are integral to the complaint and authentic"). Indeed, "to pursue any other tack would risk permitting 'a plaintiff with a legally deficient claim [to] survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied.'" *Gasner*, 162 F.R.D. at 282 (quoting *Pension Ben. Guar. Corp. v. White Consol. Industries, Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document)).

## DISCUSSION

### I. Third-Party Defendant Motion to Dismiss

Third-Party Defendant GIC seeks dismissal of CRS's Third-Party Complaint under Rule 12(b)(6) for two core reasons. First, GIC asserts that CRS has failed to set forth any mutual mistake of fact regarding the insurance policies at issue between CRS and GIC that would support its claim for declaratory relief and reformation of contract. (ECF No. 48 at 1, 6.) According to GIC, any allegations of mutual mistake of fact to support such relief are conclusory and not backed by well-pled facts. (*Id.* at 6.) Second, GIC maintains that CRS's claims against it are contingent upon there being overlapping workers compensation insurance between the coverage provided by GIC and the coverage provided by LMIC; but, argues GIC, this is a legal impossibility because LMIC was functioning as a provider of residual market insurance and cannot have insured any risk that GIC insured on the voluntary market. (*Id.* at 1, 6.) Relatedly, GIC argues that the terms of LMIC's residual market policy itself preclude coverage of any risk already insured. (*Id.* at 1-2, 6-7.)

With regard to the putative lack of any mistake of fact, GIC does not dispute that the First GIC Policy voluntarily insured all CRS workers except those in code 5183 in North Carolina and Virginia from February 15, 2013 to September 1, 2013. Nor does it dispute that the Second GIC Policy insured all CRS workers regardless of class code or state from September 1, 2013 to September 1, 2014. Moreover, GIC acknowledges that CRS paid applicable premiums and deductibles in accordance with the terms of both policies. (*Id.* at 3.) GIC argues that CRS's own actions in obtaining residual market insurance and CRS's corresponding admissions regarding its understanding of the scope of the First and Second GIC Policies preclude any plausible inference that CRS or GIC was mutually mistaken as to the coverage provided. (*Id.* at 8.)

With regard to the legal impossibility of overlapping coverage, GIC argues that it may defeat CRS's Third-Party Complaint by defending against LMIC's original claim. (*Id.* at 9 (citing Fed. R. Civ. P. 14).) GIC avers that as a matter of law, LMIC cannot have insured any risk also insured by GIC. GIC relies on provisions found in the NCCI Basic Manual and NCCI Assigned Risk Supplement (attached as Exhibits C and D to its Motion to Dismiss, respectively) for the assertion that an assigned risk policy and a voluntary policy cannot overlap.[3] (*Id.* at 9-10 (citing NCCI Basic Manual, Rule 4.A.4.a.(6); NCCI Assigned Risk Supplement 12.B.4.)); *see also Avant v. Willowglen Academy*, 367 S.C. 315, 322 (2006) (holding that assigned risk coverage automatically terminated when workers compensation coverage commenced under voluntary policy). GIC further cites *Rodriguez v. Romero*, 610 S.E.2d 488 (S.C. 2005) for the proposition that an assigned risk policy that purports to cover the same risk as a voluntary policy,

---

[3] Although NCCI is not a regulatory body, its publications, when approved by the Director of the Department of Insurance, have the force of law regarding the administration and interpretation of residual market coverage in South Carolina. *Avant v. Willowglen Academy*, 367 S.C. 315, 319-20 (2006).

11

procured after the voluntary coverage, fails to take effect. *Rodriguez*, 610 S.E.2d at 492. Moreover, GIC points to the substance of CRS's assigned risk application and the LMIC Policy itself, which itemizes coverage for code 5183 workers in North Carolina and Virginia and codes 5190 and 6325 workers in South Carolina only, as evidence that LMIC cannot plausibly have provided overlapping coverage. (ECF No. 48 at 10-14.)

CRS responds that it agrees with GIC that, as a matter of law, LMIC could not have insured on the involuntary market CRS workers that were already insured on the voluntary market by GIC. (Third-Party Pl.'s Resp. to Mot. to Dismiss, ECF No. 58 at 1, 4.) CRS correctly points out that if the Court were to grant GIC's Motion to Dismiss based on GIC's arguments regarding exclusive coverage of all but a small subset of CRS workers, such a ruling would moot LMIC's breach of contract claim against CRS. (*Id.* at 2, 4-5.) CRS maintains that its claims against GIC "are pled only in the event this Court were to hold LMIC is entitled to any additional premium and/or that GIC did not insure all CRS workers other than the 5183 [workers in North Carolina and Virginia]." (*Id.* at 3.)

CRS asserts that it has indeed alleged a mutual mistake of fact sufficient to state a claim for reformation of its insurance contracts with GIC *in the event* that the Court determines LMIC insured more workers than CRS and GIC understood during the relevant time period. This common sense argument is persuasive, and the Court agrees. It is hardly disputable that both CRS and GIC were operating under the assumption that the First GIC Policy covered all CRS workers except the 5183 workers in North Carolina and Virginia, and that the Second GIC Policy covered all CRS workers in all codes in all states. CRS and GIC have repeatedly said as much in their filings. If it

12

now turns out that this essential assumption was wrong, then CRS and GIC were indeed mutually mistaken about the scope of coverage provided by GIC. CRS sums up this point nicely: "[A]ssuming *arguendo* that LMIC's allegations regarding the scope of LMIC's coverage have any merit, there is no better evidence of a mutual mistake than both GIC and CRS arguing the same scope of coverage under the GIC Policies and potentially losing that argument to LMIC." (ECF No. 58 at 7.) Relatedly, if the Court resolved the overarching dispute in LMIC's favor, then reformation of the First and Second GIC Policies would arguably correct the mutual mistake of CRS and GIC, prevent CRS from paying twice for the same coverage, prevent GIC from paying claims for workers it did not actually insure, and prevent the duplicative coverage that both CRS and GIC claim contravenes South Carolina law. The Federal Rules of Civil Procedure explicitly permit alternative pleading, Fed. R. Civ. P. 8(d)(2), and CRS has engaged in that method as regards its Counterclaim against LMIC and its Third-Party Complaint against GIC. The Court finds that CRS has pled a mutual mistake of fact sufficient to satisfy Rule 8 as to its claim for reformation of the GIC Policies, and the Motion to Dismiss on these grounds is denied.

From the substance of the briefing on GIC's Motion to Dismiss, it appears that this case *may* permit resolution on solely legal grounds. Even when taking LMIC's Complaint into account, it would appear that many of the relevant facts are undisputed. But the Court is not in a position to dispose of the case in its entirety based on the current record, particularly in light of the fact that LMIC was not party to the briefing on GIC's Motion to Dismiss even while GIC's arguments for dismissal were largely based on a critique of LMIC's, not CRS's, allegations. LMIC's damages claim for unpaid

premium seems to be based at least in part on the fact that the named insured on the GIC Policies is InSource Employer Solutions ("InSource") and/or Entera Work Comp Solutions, LLC (*See* Pl.'s Resp. in Opp. to Mot. for Leave to Add a Party and Amend Counterclaim, ECF No. 28 at 2, 4-9; *see also* Ex. A, Third-Party Mot. to Dismiss, ECF No. 48-1.)[4] Although South Carolina law about overlapping assigned risk and voluntary coverage seems relatively clear at first blush, voluntary coverage trumps residual market coverage (*see Avant* and *Rodriguez*), there are open questions about whose employees GIC was actually covering, whether CRS was leasing those employees from InSource, and the like. *Post hoc* agreement between CRS and GIC on these points is not enough for the Court to lend dispositive weight to a Third-Party Defendant's arguments that would subsequently moot the underlying lawsuit.

If LMIC truly bore the risk for more than nine million dollars in annual payroll, it is certainly entitled to corresponding premium on a *pro rata* basis. On the other hand, if the coverage issue is as straightforward as CRS and GIC represent, then LMIC may be willing to voluntarily withdraw its lawsuit. The Court, however, suspects that resolution of this dispute is not quite as simplistic as either side wants it to be. For the time being, CRS has stated a plausible claim to relief against GIC for a declaratory judgment and reformation of the GIC Policies *on the contingency* that LMIC, and not GIC, was actually

---

[4] There are limited references to CRS in the First and Second GIC Policies, including an endorsement purportedly adding CRS to the First Policy (*see* ECF No. 48-1 at 43-45), two itemized CRS locations on a "Schedule of Named Insured and Locations" (*id.* at 46), an endorsement purportedly adding "PEO Employer Contingent Resource Solutions, LLC effective 9/1/2013" to the Second Policy (*id.* at 106-107), an endorsement purportedly adding a CRS workplace location in North Carolina (*id.* at 151-153), and numerous references to an "Employee Leasing Policy for Leased Workers of Multiple Client Companies" applicable to various CRS locations (*id.* at 109, 112, 116). The Court will note that the Second Policy indicates a CRS location involving this "Employee Leasing Policy" in Indianapolis, Indiana, which none of the parties have even mentioned. (*Id.* at 109.) The question of whose workers were actually being insured, whether they were leased employees, and whether or not there is in fact a separate body of non-leased employees that LMIC is claiming it covered is anything but clear to the Court.

providing workers compensation insurance coverage for the CRS employees in question. Accordingly, GIC's Motion to Dismiss is denied.

## II. Third-Party Defendant Motion to Stay

Shortly after filing its Motion to Dismiss, GIC filed a Motion to Stay Discovery, Disclosure, and Conference Deadlines (ECF No. 52) asking the Court to stay these deadlines until the Motion to Dismiss was resolved. LMIC opposed the stay in its Response (ECF No. 55), but the issue is now moot given that the Court has resolved GIC's Motion to Dismiss herein. Accordingly, GIC's Motion to Stay is denied as moot.

## **CONCLUSION**

For the reasons set forth above, Third-Party Defendant GIC's Motion to Dismiss (ECF No. 48) is DENIED. Moreover, GIC's Motion to Stay (ECF No. 52) is DENIED as moot. The parties are directed to confer and file a proposed scheduling order within fourteen (14) days of the issuance of this Order.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

February 24, 2016
Greenville, South Carolina